**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **TAMMY WHITFIELD,** | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | 2:09cv1084 | |
| | ) | Electronic Filing | |
| **CHARTIERS VALLEY SCHOOL** | ) | | |
| **DISTRICT and CHARTIERS** | ) | | |
| **VALLEY SCHOOL BOARD,** | ) | | |
| | ) | | |
| Defendants. | ) | | |

## OPINION

Plaintiff commenced this civil rights action seeking relief for alleged violation of her First Amendment rights. Presently before the court is plaintiff's motion for preliminary injunction. A hearing was held on October 28 and 29, 2009, wherein each side presented a number of witnesses and exhibits. The parties thereafter filed supplemental briefs and proposed findings and conclusions. The matter is ripe for adjudication. For the reasons set forth below, the motion will be granted.

Requests for injunctive relief invoke the court's equitable discretion. Resolving such motions requires a delicate balance of equitable factors. Requests for injunctive relief are to be resolved on a case-by-case basis. There are four general requirements: the moving party must (1) produce evidence sufficient to convince the court that in absence of the relief requested imminent irreparable injury will result; (2) establish a likelihood of success on the merits; (3) demonstrate

1

that granting the relief will not result in greater harm to the other party; and (4) establish that granting the relief will be in the public interest. <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 931 (1985); <u>Campbell Soup Co. v. Conagra, Inc.</u>, 977 F.2d 86, 90-91 (3d Cir. 1992); <u>ERCI v. McGraw-Hill, Inc.</u>, 809 F.2d 223, 226 (3d Cir. 1987) <u>(citing</u> <u>SI Handling Systems, Inc., v. Heisley</u>, 753 F.2d 1244, 1254 (3d Cir. 1985)). All of the above factors are balanced with regard to any final decision and the strength of any one factor may affect the necessary showing with regard to another. <u>Marxe v. Jackson</u>, 833 F.2d 1121, 1128 (3d Cir. 1987).

## Background

Plaintiff has been employed with Chartiers Valley School District ("CVSD") for the past twenty-one years, progressing from a substitute teacher, to a middle school teacher, to an instructional support teacher for the entire district.[1] She obtained a doctorate degree in May of 2000 and thereafter became principal of special programs or special education director. Plaintiff then entered into a five year employment contract with CVSD for the position of assistant superintendent. She was appointed to the position on October 19, 2004. The contract provided that plaintiff's employment would commence on November 1, 2004, and end after a period of

---

[1]The parties presented conflicting evidence on a number of areas at issue. The statements of fact throughout this opinion are made pursuant to the court's role as fact-finder in resolving the pending motion. All statements of fact and legal conclusions set forth herein are intended to constitute the findings of fact and conclusions of law required by Rule 52(2) even though they may not be specifically identified as a finding or conclusion.

five years.[2]

Two years into plaintiff's term as assistant superintendent a contractal issue arose with one of CVSD's employees, Tim McConnell.  At the time McConnell was both the Dean of Students at the middle school and the basketball coach.  Pennsylvania Public School regulations require a Dean of Students to have a Pennsylvania Public School Certificate or emergency permit.  22 Pa. Code Chapt. 49, § 49.11(a)&(b).  McConnell held the position for three consecutive school years, commencing in the fall of 2004.

McConnell's need to obtain certification became a topic of concern in negotiating a renewal of his contract in 2006.  During the negotiations, McConnell indicated he was not interested in going back to college and asked that the requirement be removed or his job description changed so certification would no longer be required.  McConnell's May 28, 2006, contract required him to obtain certification by enrolling at a university no later than July of 2006.  The administration became aware that McConnell had failed to enroll as required.  A formal conference was scheduled and Anthony Skender, the new superintendent, asked plaintiff to investigate enrollment policies at local universities in order to determine the opportunities that had been available.  At the conference McConnell was given an opportunity to explain why he had not enrolled.

Skender initially proposed that McConnell receive a 10 day suspension.  At its next

---

[2]There is a dispute about the notice of renewal requirement in plaintiff's contract. Plaintiff alleges she specifically negotiated and obtained a one year notice of renewal requirement, but then former Superintendent Sulkowski  fraudulently modified her contract to provide a notice requirement of only 210 days.  Additionally, plaintiff alleges Superintendent Sulkowski changed the expiration date of her contract from November 1, 2009, to October 31, 2009.  Defendants maintain that the approved contract contained a 210 day notice requirement and an expiration date of October 31, 2009.

scheduled meeting Skender met with the Chartiers Valley School District Board of Directors ("board") in executive session about the proposed suspension.  The members of the board informally made recommendations as follows: five members supported a twenty day suspension, three members supported a ten day one, and one member was opposed to any suspension. Skender suspended McConnell on August 24, 2006, for twenty days without pay.

McConnell appealed his suspension and a public hearing was held on November 1, 2006, before a hearing officer appointed by the board.  Plaintiff was asked to appear at the hearing by the district's (and board's) solicitor and testify under oath regarding certain  background facts and events leading to McConnell's suspension.

The appeal suspension hearing was a formal proceeding authorized by Pennsylvania law governing local agencies.  A neutral hearing officer conducted the hearing and a court stenographer recorded the testimony.  McConnell's suspension proved to be a contentious issue in the community both at the hearing and thereafter.  There were between 50 and 100 members of the public present.  Plaintiff testified that "based on McConnell's history with his contracts, he has not complied with going to college."  McConnell Hearing Transcript (Plaintiff's Exhibit No. 5) at 160.  She also recounted the meetings between her, Superintendent Skender and McConnell concerning  his failure to obtain the requisite certification and the board members' general reaction to his failure to comply with the terms of his contract.

Board members Jeff Choura and Bridget Kelly were in the front row of the audience during plaintiff's testimony.  Several times during the course of plaintiff's testimony Choura and Kelly booed and expressed their disapproval of plaintiff's testimony.

McConnell's attorney pursued a line of questioning with plaintiff in an attempt to show

there was bias expressed against McConnell in an executive session of a board meeting when his suspension was brought up for discussion.  Plaintiff was asked if any board members had commented or said that "McConnell had snubbed his nose" at the board or school administration. She recalled a statement being made to that effect.  Upon further questioning she could not recall who had made the comment.  At that juncture the comments and expressions of disapproval became so disruptive that the solicitor for the district asked the hearing officer to remind the members of the audience that the format was not a public meeting, but instead was a public hearing, and those in attendance would have to refrain from reacting verbally to the testimony.

Plaintiff was then questioned about McConnell's prior contracts and the amount of time over which he had failed to obtain the "certification" or "accreditation" that was necessary to hold the Dean of Students position.  She recounted that acquiring certification had been an obligation in McConnell's employment contracts since 1998.  McConnell Hearing Transcript (Plaintiff's Exhibit No. 5) at 103.  When asked to expound on whether McConnell had in effect "snubbed his nose" at the administration with regard to pursuing the certification or accreditation needed to occupy the Dean of Students position, plaintiff testified:

> Again, I don't know that I would have used those words but based on the history
> of the contracts, yes, that is what happened.

Id. at 156.  McConnell's attorney established through further questioning that the Pennsylvania Department of Education had not raised the issue of McConnell's failure to satisfy the requirements needed to maintain the Dean of Students with the district's administration in writing or through an audit.  He also established that plaintiff was unaware of any earlier written notice being given to McConnell that he was in violation of his prior contracts.  Id. at 158-61.

When asked if she could recall the way board members had voted in the informal poll, plaintiff indicated she could not recall.

At the conclusion of plaintiff's testimony, board member Choura stood up, yelled out that he wanted the record changed, and alleged "she's (plaintiff's) lying." He continued to shout and asked that plaintiff's comments be stricken from the record. He asked to be heard. The hearing officer advised Choura that he could not speak unless he was called as a witness. The solicitor then asked to go off the record and the hearing officer granted that request. No additional testimony was taken that day.

The hearing officer ultimately recommended that McConnell's suspension be upheld. At a regular board meeting in February of 2007, the board adopted the hearing officer's recommendation by a vote of five to two, with Choura and Kelly voting against upholding McConnell's suspension.

At a special action school board meeting on April 10, 2007, a motion was presented to open up all boys basketball coaching positions for the 2007-08 school year. The board voted five to four to open up the positions, with Choura and Kelly voting against opening up the contracts. Choura commented that this "is a very black day in the history of Chartiers Valley." Board member Petronsky noted that opening the positions up did not mean the board would not rehire the coaches currently occupying the positions.

On April 20, 2007, Pennsylvania Department of Education performed an audit of CVSD. It imposed a fine of $11,826.60 for the failure to have an appropriate instructional certificate for McConnell.

There was significant public outcry concerning the opening of McConnell's coaching

position.  At the next board meeting a number of residents appeared and read statements in support of rehiring McConnell.  Skender recommended that the board rehire McConnell as the head varsity basketball coach.  Choura moved to adopt the recommendation and the measure was carried by a vote of 8 to 1.  During the course of the discussions that evening, Choura referred to Petronsky's comment that opening the contract does not mean that the person will not be retained.  He then remarked that "that is exactly what it means."

In August of 2007 the board passed motions to create a new position of Transportation/Activities Coordinator and assign McConnell to the position for one year.  This in effect permitted McConnell to maintain his employment without certification.  Board member Choura voted no, stating that he was a "big fan" of McConnell, and felt it was unfair to penalize McConnell by placing him in the new position and reducing his salary by about $10,000.

At that very same meeting, the issue of  raises for administrative members came up for vote, which included raises for Skender, plaintiff, Director of Human Resources Donald Kaminski, and so forth.  Six members voted in favor of the raises, with board members Choura and Kelly abstaining from voting on the ground that the weekly packet distributed to board members did not contain the information about the raises and they wanted to see the proposal in writing before voting.  Another member noted that the raises had been discussed at the board meeting held three months prior.  Choura and Kelly acknowledged that the discussion had occurred, but said they wanted to review the raises.

On February 26, 2008, the board adopted a settlement agreement that reduced McConnell's suspension from 20 days to 10 and awarded him 10 days of back pay.  The measure also eliminated any requirement that McConnell return to college.

Plaintiff received a letter from the CVSD dated March 27, 2009, notifying her that her contract was set to expire on October 31, 2009.  The board secretary indicated that he was notifying her 210 days in advance of that expiration, as required by her contract.[3]   The renewal of plaintiff's contract was placed on the agenda of the next three executive session school board meetings.  No action was taken on the matter at those sessions or the formal meetings that followed those sessions.

During the first few weeks of May 2009, plaintiff worked with Director of Human Resources Don Kaminski to form a proposed contract containing some provisions she wanted to be included in her new contract.  Kaminski assisted plaintiff by incorporating those provisions into the draft contract template that was used by the solicitor of the district.  In the middle of May Kaminski worked with plaintiff on a number of issues in order to create a contract that could be presented by the administration to the board.  After further suggestions and advice from Kaminski, a version that appeared to be acceptable to plaintiff was crafted.

On May 12, 2009, Kaminski suggested to the board in executive session that they form a committee to deal with the renewal of plaintiff's contract.  A number of the board members agreed that doing so was a good idea and certain members expressed their desire to be on the committee.

On May 26, 2009, Art Turner, facilities manager for the school district, dropped by plaintiff's office as he did from time to time.  He told plaintiff that "you remind me of Eleanor

---

[3]Plaintiff contends that her actual contract required 365 days of notice prior to its expiration, and when that was not received in the fall of 2008 her contract automatically renewed.  Defendants contend that the contract on file with the administration is plaintiff's actual contract, and it calls for advanced notice of 210 days.

Roosevelt." Plaintiff giggled and asked what he meant. Turner said because you're a strong leader, a good woman and "she" never let them see her cry. Plaintiff asked "why am I going to cry." Turner relayed that Choura had just told him that because plaintiff testified against McConnell, she was never going to get a contract.

On May 28, 2009, School Board Solicitor Alfred Maiello received a call from Superintendent Skender advising that there appeared to be a mistake or some unresolved issues in the contract that was to be presented to the board. Attorney Maiello was aware that the issue of plaintiff's contract would be presented to the board that night, so he and his partner, Attorney Michael Brungo, drove down to the school to resolve all discrepancies so that a contract that plaintiff would sign could be presented to the board. After a lengthy meeting of several hours, a proposed contract was prepared by Attorney Brungo and given to Skender for presentation to the board that night.

The advice conveyed to the board prior to the formal school board meeting by Maiello and Brungo was that the board had three options concerning a contract for plaintiff: it could do nothing, in which case the "prior" contract would renew, but its terms would be uncertain; it could approve the contract to be presented; or it could open up plaintiff's position, which would permit the board to further consider plaintiff's proposed contract and negotiate any terms or changes thought by the board to be necessary. In executive session concern was raised that the proposed contract had not been included in the packet circulated to board members prior to the meeting, and as a result the members had not yet had an opportunity to review and consider the actual terms of the contract. Attorney Brungo advised that if the board was unwilling to approve the contract actually presented, then it was his advice that they should open up the position so

9

that they would have adequate time to negotiate with plaintiff.  The solicitor emphasized that opening up the contract did not mean that the board could not continue with discussions about a contract and then enter into a contract with plaintiff.  It would just comply with the mandatory notice requirement under the School Code and keep the prior contract from renewing automatically.  He presented a handwritten statement to Board President Patty Figorski explaining that the action to open up the contract was being taken in order to gain additional time to consider the contract, and the action was not any reflection on the performance of plaintiff.

At the May 28, 2009, formal school board meeting, Skender presented a proposed contract for plaintiff near the end of the meeting and recommended that it be approved.  A discussion ensued concerning Skender's presentation of the contract without advanced notice and the board members' frustration with receiving contracts and being asked to vote on them without time to review and discuss the matter.  Choura moved to notify plaintiff that it was the board's decision to open up her contract and consider other candidates for the assistant superintendent position.  Kelly seconded the motion.  The board approved the motion by a 6-3 vote.  The approving members noted that the decision was not to be understood as a negative reflection on plaintiff's performance.  Board member Frey voted against opening up plaintiff's contract, and made comment that Skender had not recommended such action and she was wholeheartedly and vehemently against it.  An exchange between Frey and Choura ensued, and Frey eventually left the meeting.

The original minutes from that meeting reflected that the board received the contract shortly before being asked to vote on it and the members voting affirmatively wanted additional time to review the contract.  The minutes also generally indicated that comments had been made

to the effect that the decision to open up plaintiff's contract was no reflection on plaintiff's performance. Joan Kendra, an office specialist in the human resources department, who had been attending and transcribing school board meetings since 1994, transcribed the minutes from the meeting within a few days thereafter.

Kendra took shorthand notes of board meetings and used a tape recorder as a backup measure. She had always produced the minutes by summarizing what had occurred at the meeting as reflected in her shorthand notes. She only listened to the tape if her notes were unclear.

After the minutes had been made available to the board, Kendra was called to Board Secretary Nick Morelli's office and asked by him and Figorski if she knew why there was no tape of the meeting. Kendra explained that the recorder had malfunctioned and there was no tape available. Kendra was then told that she had to amend the minutes and handed statements purporting to be verbatim statements of Figorski and Kelly made at the meeting regarding plaintiff and the decision to open up her contract.

The original version of the minutes indicated that Figorski commented that "this action does not preclude our consideration of Dr. Whitfield from a contract, but as responsible board members we want to take additional time to review the contract before us" and the action taken "is not a reflection on Dr. Whitfield." The original minutes indicated Kelly said "we want to be thorough" and reiterated that "this has nothing to do with Dr. Whitfield." "She has sat here for 16 years and other contracts are before us months before they are up. It is the law."

The amended statements Kendra was required to incorporate into the minutes provided the following rendition of Figorski's comments: "this action is being taken to allow the Board the

11

appropriate time needed to review the contract.  Our solicitor has recommended to all of us that

this is our most responsible course of action.  Timing and the law have made this our only

choice.  Again, it is not a reflection on Dr. Whitfield."   The portion regarding Kelly's statements

was revised to provide: "We want to be thorough.  This has nothing to do with Dr. Whitfield's

performance.  I have been on this board for 16 years and never remember a contract being given

to us with such short notice. We being responsible board members could not in good conscience

sign a contract that we saw 10 minutes before coming out to a voting meeting.  Again, this has

nothing to do with Dr. Whitfield's performance."

Kendra had never before been told or even asked to amend the minutes of a board

meeting she had transcribed.  She was not asked to review her shorthand to determine what it

reflected concerning Figorski and Kelly's statements at the meeting; she simply was told she had

to amend the minutes and was handed statements that were to be incorporated into the minutes.

While Figorski and Kelly had made statements at the meeting that reflected some of the same

thoughts, the exact words in the revised amendments were not stated at the meeting.

On June 1, 2009, Figorski sent an email to all board members asking for their input on

plaintiff's proposed contract.  She asked that each member either respond by indicating he or she

was okay with the contract as written, or provide any suggestions or comments.  Figorski

indicated that she and board member Ohliger would review everyone's input and discuss their

suggestions with solicitors Maiello and Brungo.  Board members Frey, McIntyre and Petronsky

responded to Figorski's email indicating they were fine with the contract as presented.  Board

member Galluze proposed changes to the contract.  Frey also wanted to know when the board

had decided against forming a committee to work on plaintiff's contract.  Figorski never

responded to Frey's email.

On June 9, 2009, Solicitors Maiello and Brungo received a letter advising that plaintiff had hired counsel to represent her in all matters concerning her employment with the school district. The letter highlighted what plaintiff claimed to be differences between the contract she signed in October of 2004 and the contract that was shown to her in February or March of 2009 and which was being represented as the official 2004 contract. It highlighted the asserted failure to provide timely notice under the former version and the failure to pay a difference between the cost for certain health care coverage and the coverage actually selected by plaintiff. It invited negotiation as to these issues so as to avoid litigation.

Solicitor Maiello notified the board that plaintiff had engaged counsel. Maiello advised that in light of plaintiff obtaining representation, he could no longer have discussions directly with plaintiff concerning her contract. Such direct discussions would have to go through plaintiff's counsel. He also advised that the board should no longer discuss any contract issues directly with plaintiff, but instead should direct any communications for plaintiff to her attorney. He did not advise that the board members should no longer discuss any issues surrounding plaintiff's contract among themselves or that they could not or should not seek to reach agreement among themselves with regard to a contract for plaintiff.

At the next board meeting Solicitor Maiello was asked in executive session if plaintiff was required to attend executive meetings or could she come on an as-needed basis. Maiello advised that the School Code did not give an assistant superintendent the right to attend school board meetings and she could be excluded from any such session as deemed appropriate. It was his understanding that plaintiff would be asked to attend thereafter on an as-needed basis.

13

Figorski directed Skender to advise plaintiff that she would no longer be permitted to attend school board meetings, which he did.  Plaintiff was not permitted to attend any school board meeting after June 9, 2009, regardless of whether the agenda for any particular meeting or session did or did not involve matters pertaining to her contract.

In July of 2009, plaintiff was meeting with Human Resources Director Donald Kaminski. Art Turner walked into the office.  Plaintiff asked Turner if he was going to tell the truth when he was called to testify.  Turner said "no" or "no, I'm going to lie."  From Kaminski's perspective the question was asked with intent and Turner's response was given in the same vein, with no joking around.  Kaminski got up, said "I may have to testify to this," and left the room.

At the August 11, 2009, school board meeting, board member McIntyre asked in executive session if the other members had given any further thought to coming up with a contract for plaintiff.  Board member Galluze responded: "she hired an attorney so I wash my hands of her."  Board member Kelly agreed and further commented that plaintiff's hiring an attorney did not show good faith, so she had no interest in further pursuing the matter.

Plaintiff filed this action on August 17, 2009.  The renewal of plaintiff's contract was not brought up for discussion at any time between May 29, 2009, and October 29, 2009.   The board did not take any action or make any proposal toward offering a contract to plaintiff.  At the October 28, 2009, school board meeting the board declined to consider engaging in further negotiations with plaintiff.  Plaintiff's contract expired on October 31, 2009, or November 1, 2009.

The parties vehemently dispute whether plaintiff has made a showing of irreparable harm. Defendants contend that plaintiff's claim is premised on speech that does not enjoy protection

14

under the First Amendment and plaintiff cannot establish irreparable injury because she has an adequate remedy at law.  Plaintiff contends that her testimony was protected speech under the controlling precedent and the record supports her request for relief.

A clear showing of an imminent irreparable injury is an absolute necessity in obtaining injunctive relief.  Marxe, 833 F.2d at 1128 (citing Moteles v. University of Pennsylvania, 730 F.2d 912 (3d Cir.), cert. denied, 469 U.S. 855 (1984) and A.O. Smith Corp. v. F.T.C., 530 F.2d 515, 525 (3d Cir. 1986)); ECRI, 809 F.2d at 226.   "Establishing a risk of irreparable harm is not enough."  A "clear showing of immediate irreparable injury" is required.  ECRI, 809 F.2d at 226 (citing Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980)). "The 'requisite feared injury must be irreparable — not merely serious or substantial,' and it "must be of a peculiar nature, so that money cannot atone for it."  Id.  (citing Glassco Hills, 558 F.2d 179, 181 (3d Cir. 1977)).

It has long been settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373-74 (1976) (citing New York Times Co. United States, 403 U.S. 713 (1971));  accord Swartzwelder v. McNeilly, 297 F.3d 228, 241-42 (3d Cir. 2002) (citing Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998)).  It is equally well-settled that refusing to renew an employee's contract for public employment as a result of the employee's exercise of First Amendment rights, even where the employee does not have a right to such a renewal, constitutes a form of retaliation prohibited by the First Amendment.  See e.g. Newsom v. Norris, 888 F.2d 371, 376 (6th Cir. 1989) ("Existing case precedent indicates that a failure to reappoint an individual to a position is equally impermissible, even where there was no cognizable expectation of continued service, if

reappointment was denied because of the individual's exercise of First Amendment rights.") (collecting cases in support).  It follows that if plaintiff can establish that her contract was not renewed due to retaliation for the exercise of First Amendment rights, the irreparable harm needed for injunctive relief will be satisfied.

Defendants strenuously argue that plaintiff's claim cannot proceed because any testimony given at the McConnell hearing was given pursuant to plaintiff's official duties as assistant superintendent, and as a result her claim is barred by the threshold "official duties" analysis established in Garcetti v. Ceballos, 547 U.S. 410 (2006).   From their perspective, the record shows only that plaintiff was asked by her supervisor to investigate certain matters underlying a school district employee's conduct and her testimony was nothing more than the recounting of her familiarity with the underlying facts leading the administration to impose discipline on McConnell and what her investigation into the circumstances of McConnell's failure to seek certification had uncovered.  In other words, her testimony reflected and constituted nothing more than "speech" commissioned by the employer and given solely in the capacity of her duty as an employee.   And as a consequence, the speech cannot survive the "official duties" analysis mandated by Garcetti.

Plaintiff argues that her speech is protected because testimony does not fall within the ambit of speech made "pursuant to official job duties" and therefore is not removed from First Amendment protection under Garcetti.  Plaintiff maintains that she had an independent duty as a citizen to testify truthfully, and the protection afforded by the First Amendment to her fulfilment of that duty is not displaced by the fact that work-related matters were an impetus for the subject matter of her testimony.

16

The principle issue is whether an assistant superintendent's testimony under oath at a disciplinary appeal school board hearing, at which the employee voluntarily appeared at the school district's solicitor's request, is protected under the First Amendment in light of the Court's decision in Garcetti. We find that such testimony is protected speech for the reasons set forth below.

In Garcetti, the Court addressed whether the First Amendment protects a public employee from discipline based on speech made pursuant to the employee's official duties. Id. at 413. It held that when public employees make statements pursuant to their official duties they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. Id.

There, the plaintiff, Richard Ceballos, was employed as a deputy district attorney for the Los Angeles County District Attorney's Office and held the position of "calender deputy," which vested him with certain supervisory responsibilities over other assistants. Id. A defense attorney contacted Ceballos about inaccuracies in an affidavit used to obtain a critical search warrant in a pending case. After reviewing the affidavit and investigating the matter, Ceballos determined that it contained certain factual inaccuracies that amounted to serious misrepresentations. Id. at 414. He communicated his concerns to his supervisors and followed up with a "disposition memorandum" recommending dismissal of the case. Meetings were held with the warrant affiant and his supervisors from the Sheriff's Office, which became quite heated. Despite Ceballos' concerns, the district attorney's office ultimately decided to proceed with the prosecution. The trial court held a hearing on a motion to challenge the warrant, and Ceballos was called by the defense to describe his concerns about the affidavit. The trial court denied the motion

17

challenging the warrant.  Id.

After the trial, Ceballos was reassigned to a lower position, transferred to another courthouse, and denied a promotion.  Id. at 415.  He filed suit against the district attorney's office shortly thereafter, alleging he suffered retaliation based on his disposition memorandum in violation of the First Amendment.  Id. at 415.  Among other positions, the district attorney's office took the position that the memo did not constitute protected speech.  Id.  The district court granted summary judgment to the defendants on the ground that the memo was written pursuant to Ceballos' official employment duties, and thus not entitled to First Amendment protection.  The United States Court of Appeals for the Ninth Circuit reversed, holding that the allegations of government wrongdoing in the memo constituted protected speech.  Id.

The Supreme Court held that Ceballos' expressions in the memo were not protected by the First Amendment.  It observed that its First Amendment precedents in the area of government employee speech have "sought to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important government functions."  Id. at 420.  These dual principles are designed to ensure that the First Amendment rights of government employees are accorded adequate protection while precluding public employees from gaining the ability to constitutionalize the inter-office grievance process.  Id.

Drawing on these principles, the Court reasoned that

[t]he controlling factor in Ceballos's case is that his expressions were made pursuant to his duties as a calendar deputy.  That consideration – the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a case – distinguishes [his] case from those in which the First Amendment provides protection against discipline.

18

Id. at 421.  Because Ceballos wrote the memo solely in the course of fulfilling his official duties -- indeed, he was performing the work he was paid to perform -- and the government employer had the right to control the content of that work in performing its official functions, the First Amendment did not protect Ceballos from managerial discipline based on that work.  Id. at  422.

In reaching the above disposition, the Court reasoned that limiting an employee's speech that arises only as part of his "professional responsibilities" does not encroach on the freedoms the employee enjoys as a citizen; such limitation merely "reflects the exercise of employer control over what the employer itself has commissioned or created."  Id.  Although it endorsed this reasoning, the Court was careful to note that the fact that Caballos expressed his views in the office as opposed to a public setting was not dispositive.  Id. at 420.  Nor was the fact that the memo concerned the subject matter of Cabellos' employment.  Id.  Such sweeping propositions fail to maintain the proper boundaries between treating public employees as any other member of the public on matters within the scope of the First Amendment and preserving employer control over matters assigned to the employee to fulfill the employer's official functions.  Id. at 421-22.

Two years later, in Reilly v. City of Atlantic City, 532 F.3d 216 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit decided whether courtroom testimony given pursuant to a government employee's official duties is still protected by the First Amendment post-Garcetti.  Reilly, 532 F.3d at  228.  There, Reilly, a police officer, testified in a criminal prosecution about several corruption investigations he had conducted that centered around an Atlantic City police officer that advanced to the position of the Director of Public Safety for Atlantic City after the trial was over.  Reilly was called by the prosecution to testify against the Director's friend and colleague.  After the trial, the Director recommended that Reilly be removed

from the promotion list, suspended for ninety days and demoted from sergeant to patrolman.  The Director's recommendations were made known to Reilly before they were implemented and thereafter the Director offered to permit Reilly to retire with the rank of sergeant before any of the measures were instituted.  Reilly retired and then filed suit against the Director and others for retaliating against him in violation of the First Amendment.

In analyzing Reilly's retaliation claim, the district court considered whether Reilly's speech touched on a matter of public concern and whether the Pickering balancing test weighed in Reilly's favor.  Id. at 228.  It resolved both of these inquiries in Reilly's favor in denying the defendants' motion for summary judgement based in part on the doctrine of qualified immunity.  Id. at 223.  The defendants filed an interlocutory appeal.

The defendants challenged the court's jurisdiction to hear the appeal.  They argued that Reilly's speech was given as a function of his official duties and thus it was not protected under Garcetti.  Id. at 227.  After noting that the Supreme Court had described the inquiry into whether an employee's speech is given pursuant to his or her official duties as "a practical one" that is not controlled by formal job descriptions and the listing of a task in a written job description is "neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes," the court observed that there had been no fact-finding by the trial concerning whether Reilly's speech was given "pursuant to his official duties."  Id. at 227.  Furthermore, the parties disputed the matter.  The court noted that although some aspects of Reilly's speech in the context of the investigation required further factual development by the district court, the "fact of Reilly's sworn testimony at the Munoz trial is sufficiently developed on this appeal for us to consider as a matter of law whether that speech

was made 'pursuant to [his] official duties' [under <u>Garcetti</u>] so as to foreclose his retaliation

claim, or whether that speech entitled Reilly to the protections of the First Amendment." <u>Id.</u> at

228.

In conducting its analysis the Third Circuit observed that its prior precedent has

recognized that "<u>Garcetti</u> simply 'narrowed the Court's jurisprudence in the area of employee

speech' by further restricting the speech activity that is protected." <u>Id.</u> (quoting <u>Foraker v.

Chaffinch</u>, 501 F.3d 231, 240 (3d Cir.2007)).  Thus, following <u>Garcetti</u>,

> [a] public employee's statement is protected activity when (1) in making it, the
> employee spoke as a citizen, (2) the statement involved a matter of public
> concern, and (3) the government employer did not have "an adequate justification
> for treating the employee differently from any other member of the general
> public" as a result of the statement he made [i.e., the <u>Pickering</u> balancing test].

<u>Id.</u> (quoting <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241-42 (3d Cir.2006) (quoting <u>Garcetti</u>,

547 U.S. at 418) (same)).  Because the district court already had addressed the second and third

factors, "the effect of <u>Garcetti</u> in the context of [the] appeal [was] limited to the question [of]

whether Reilly spoke as a citizen when he testified at the Munoz trial." <u>Id.</u>

The court began its analysis by highlighting the axiom that  "[e]very citizen…owes to his

society the duty of giving testimony to aid in the enforcement of the law." <u>Id.</u> at 228 (quoting

<u>Piemonte v. United States</u>, 367 U.S. 556, 559 n.2 (1961) and collecting substantial authority in

further support).  After surveying Supreme Court precedent spanning much of the twentieth

century, the court observed that "[t]he notion that all citizens owe an independent duty to society

to testify in court proceedings is thus well-grounded in Supreme Court precedent." <u>Id.</u> at 229.

The precedent in the Third Circuit likewise has consistently recognized the importance of this

principle in evaluating First Amendment claims, regardless of whether the employee is compelled or voluntarily appears in court.  Id. (summarizing Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996 and Green v. Philadelphia Housing Auth., 105 F.3d 882, 887 (3d Cir.1997)).  The integrity of the truth seeking process inherently provides "compelling reason" to sanction even voluntarily given testimony as involving a matter of public concern.  Id. (citing Green, 105 F.3d 886).  This is so because "[t]he utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony at such proceedings."  Id. at 230 (quoting Green, 105 F.3d at 887).

The court also observed that Garcetti left open the question of whether testimony given as a result of an investigation preformed by the employee as part of his or her official duties enjoys First Amendment protection.  Id. at 231 ("The Garcetti opinion focused solely on the speech contained in Ceballos' internal memo, leaving to the court of appeals on remand the opportunity to consider whether Ceballos' conduct at the meeting and his testimony in court were entitled to First Amendment protection.") (citing Garcetti, 547 U.S. at 443-44 (Souter, J., dissenting)).  The court thus turned to the settled principles "that every citizen owes his Government" a duty to provide truthful testimony and that a  "citizen's obligation to offer truthful testimony in court is necessary to protect the integrity of the judicial process and to insulate that process from outside pressure" for guidance.  Id. ("Because Garcetti offers no express instruction on the application of the First Amendment to the trial testimony of a public employee, we turn to the settled principles discussed above....").  Reasoning that the duty to testify truthfully is not vitiated by one's status as a newsman or as President of the United States, it opined that "the citizen's obligation to testify truthfully is no weaker when one is employed by the government [than] in any other

capacity." Id. (citing Branzburg v. Hayes, 408 U.S. 665, 690-91 (1972) and United States v.

Nixon, 418 U.S. 683, 709 (1974)).  The court concluded:

> Thus, the act of offering truthful testimony is the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee. That an employee's official responsibilities provided the initial impetus to appear in court is immaterial to his/her independent obligation as a citizen to testify truthfully.
>
> When a government employee testifies truthfully, s/he is not "simply performing his or her job duties," Garcetti, 547 U.S. at 423, 126 S.Ct. 1951; rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence. Ensuring that truthful testimony is protected by the First Amendment promotes "the individual and societal interests" served when citizens play their vital role in the judicial process. Id. at 420, 126 S.Ct. 1951. Thus, the principles discussed in Garcetti support the need to protect truthful testimony in court.

Id. at 231.  Thus, testimony given in court constitutes citizen speech and a claim of retaliation

based on providing such testimony "is not foreclosed by the 'official duties' doctrine enunciated

in Garcetti."  Id.

Defendant advocates that Reilly reflects an "inconsistent [approach] with the framework

of Garcetti, which requires the initial inquiry to be whether the speech at issue was made in the

course of the plaintiff's job duties."  Defendant's Memorandum of Law Addressing First

Amendment Issues (Doc. No. 27) at 2.  From its perspective the rationale in Reilly is inconsistent

with Garcetti and the proper focus is whether the speech was made as part of the employee's job

duties.  Id. at 3 (citing Huppert v. City of Pittsburg, 574 F.3d 696, 708 (9th Cir. 2009) (criticizing

Reilly as constituting  "an impermissible chipping away at the plain holding in Garcetti.").  In

this regard plaintiff's testimony was addressed to "the ultimate school district employer, the

Board of School Directors, on a matter that impacted, exclusively, McConnell's employment."

Id. at 5.  Thus, plaintiff's testimony was not given as a citizen, but as the second highest school district administrator who had been tasked with the duty to investigate and help enforce the administration's position regarding the enforcement of McConnell's contract.  She was acting solely within her capacity as school administrator and the fact that McConnell invoked his right to a public hearing (as opposed to a private one) is a factor beyond plaintiff's control and one that should not change the fundamental nature of what plaintiff was doing when she testified: performing an official job function that had been assigned to her.  Because the board is empowered to take action against plaintiff if her testimony is to the board and made pursuant to employment by the board, she can reap no greater benefit by the fact that her job performance entailed the providing of testimony under oath.

Defendant's position is flawed on multiple levels.  First, defendant's position fails to appreciate the nature of the speech that was removed from First Amendment protection in Garcetti.  Ceballos was an attorney tasked with conducting analytical review of matters arising in pending prosecutions and formulating the district attorney's official policy on any particular matter under his review.  He fulfilled this duty by preparing an internal memorandum reflecting his recommendation as to what should be the official action of the office.  In this capacity, Ceballos' memo was the quintessential of speech commissioned by the employer: it reflected nothing more than the employer's own speech and it was speech that the employer had an unfettered right to control.  And the district attorney's office had every right to exercise that censorship through its control over the employee tasked with and paid for the creation of that official office policy: Ceballos.  Garcetti, 547 U.S. 422 (noting that the memorandum Ceballos created was the employer's speech and citing as support Rosenberger v. Rector and Visitors of

24

Univ. of Va., 515 U.S. 819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"); accord Waters v. Churchill, 511 U.S. 661, 674-75 (1994) (a government employer has a significant interest in regulating the speech of its employees made in performing their official duties because such speech may well be essential to carrying out its public mission in an effective and efficient manner). Furthermore, the memo was not authored for any purpose beyond the formulation of official office policy on the issues addressed therein. Thus, the speech concerned only the formulation of internal policy by a professional tasked with the responsibility of its formulation and the employer retained an absolute right to control the performance of its employee in the formulation of that policy.[4]

Plaintiff's testimony at the school board disciplinary hearing is of a different nature. It was given under oath and in a format where the board had no right to control the content of what was said or how it was conveyed. To exercise such control so would violate the due process rights of McConnell and plaintiff and would be tantamount to having the right to compel an

---

[4]Both the Supreme Court and the Third Circuit emphasized these aspects of the speech at issue in Garcetti. In Garcetti, the Court specifically emphasized:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

Garcetti, 547 U.S. at 422; see also Reilly, 532 F.3d at 226 (citing Garcetti, 547 U.S. at 421-22, 424).

employee to commit perjury.  While plaintiff had been tasked with the responsibility to investigate the matter and relay what her investigation had uncovered, and she was asked at the hearing about various historical events that had occurred in conjunction with McConnell's contract, her testimony was not the formulation of official office policy about what should be done.  That "speech" rested with Skender, who imposed the formal sanctions on McConnell, and ultimately the board, which upheld the administration's official position.  Thus, an analogous situation to Garcetti would be the formulation of an official office memorandum by plaintiff or Skender that recommended that the administration impose discipline on McConnell for his failure to comply with contract and School Code requirements.  Such "speech" is not at the base of plaintiff's claim.

Second, defendant's attempt to defeat plaintiff's First Amendment claim by reducing the setting in which that claim arises to an arena under the exclusive control of the board  is unavailing.  The fact that plaintiff's sworn testimony was given at a school board hearing, as opposed to inside a courtroom, is a distinction without a difference.  Plaintiff's testimony at the suspension appeal hearing had legal consequences far beyond an internal employee matter committed exclusively to the exercise of the board's legal prerogatives.  Her testimony became part of the official record that could be relied upon by either party if an appeal of the school board's decision was taken.

A hearing under the School Code can be convened in conjunction with any disciplinary matter and must be convened for any termination of a tenured employee. 24 P.S. § 11-1127.  The testimony must be recorded by a disinterested stenographer.  Id.  The testimony must be given under oath.  24 P.S. § 11-1128.  The power of subpoena may be utilized by any party and resort

to the contempt power of the Pennsylvania courts may be had for non-compliance.  Id.

Under Pennsylvania law, a "tenured" or professional employee aggrieved by the action of a school board may appeal to the Secretary of Education.  24 P.S. § 11-1131.  The Secretary of Education "shall review the official transcript of the record before the board, and may hear and consider such additional testimony as he may deem advisable to enable him to make a proper order."  Id.  Although the Secretary's review is de novo, the Secretary has discretion to rely entirely on the transcript produced at the hearing before the board.  See  Rhodes v. Laurel Highlands School Dist., 544 A.2d 562, 564 (Pa. Commw. 1988) (affirming decision of Secretary where, without taking additional testimony, "the Secretary handed down an opinion which adopted with some slight modification most of the Board's findings of fact and, after an extensive review of the record made at the hearings and a review of the law pertinent thereto, concluded that the evidence was sufficient to warrant Rhodes' dismissal."); Forest Area School Dist. v. Shoup, 621 A.2d 1121, 1123 (Pa. Commw. 1993) (affirming Secretary decision based on "de novo" review of hearings before board); Belasco v. Board of Public Education of the School District of Pittsburgh, 510 A.2d 337, 340 (Pa. 1986) ("In an appeal by an aggrieved professional employee under Section 1131 of the School Code, the Secretary is vested with the authority to conduct de novo review whether he takes additional testimony or merely reviews the official record of the proceedings before the Board.... Minimum requirements of due process demand that a litigant have, at some stage of a proceeding, a neutral fact-finder.") (quoting Appeal of Spano, 439 Pa. 256, 262-63, 267 A.2d 848, 851 (1970));  Katruska v. Bethlehem Center School Dist., 767 A.2d 1051, 1056 (Pa. 2001) ("We find, however, that the Secretary of Education's de novo review of the decision of a school board ensures that the requirements of due process are

27

satisfied. The determination to be reviewed on appeal to the Commonwealth Court is that of the impartial factfinder, the Secretary of Education, rather than that of the school board. The professional employee is provided with notice, opportunity to be heard, and the chance to defend himself or herself before a fair and impartial tribunal through the procedure implemented under the Public School Code."); Covert v. Bensalem Tp. School Dist., 522 A.2d 129, 131 (Pa. Commw. 1987) (finding Secretary's de novo review of transcripts before the school board hearing and issuance of independent findings based thereon constituted an "appropriate review under the Belasco standard.").

Moreover, "[s]chool boards are local agencies ... and jurisdiction of appeals therefrom [otherwise] is vested ... in the courts of common pleas." Rike v. Com., Secretary of Educ., 494 A.2d 1388, 1390 (Pa. 1985) (citing 2 Pa. C.S.A. § 101 &  42 Pa.C.S.A. § 933(a)(2)). "The Public School Code provides exceptions to this appellate jurisdiction of common pleas court for decisions of school boards dismissing or demoting tenured teachers, 24 P.S. §§ 11-1131, 11-1151, and for disputes over accumulated sick leave, 24 P.S. § 11-1154.  In these cases, jurisdiction of the appeals is vested in the Secretary of Education." Rike, 494 A.2d at 1390. Appeal of the Secretary's order may be taken in the Commonwealth Court.  See Rhodes, 544 A.2d at 564; Forest Area School District, 621 A.2d at 1123.  Otherwise, jurisdiction of the appeal may be had in the first instance in the court of common pleas.  See e.g. Monaghan v. Board of School Directors of Reading School Dist., 618 A.2d 1239, 1241 (Pa. Commw. 1992) (appeal from school board's termination of school district business manager was in the first instance to the court of common pleas).   Either approach permits an aggrieved party to appeal to the Pennsylvania court system. Id..; see also 2 Pa. C.S.A. § 752.

Where an appeal is taken the transcribed hearing before the board has legal import and becomes part of the record on which the reviewing court must rely to adjudicate the appeal. The reviewing court can review the matter de novo or remand for further proceedings when the record is incomplete; otherwise, it is to review the record before the board. Whether the record is sufficiently complete for the purposes of review is committed to the discretion of the court. Monaghan, 618 A.2d 1241-42 ("Section 754(a) of the Administrative Agency Law gives the trial court discretion as to the manner of implementing a deficient record before the local agency."). Critical to this inquiry is whether there is a complete and accurate record of the testimony taken so as to permit the aggrieved party to perfect the appeal. Id. (quoting Springfield School District v. Shellem, 328 A.2d 535, 538 (Pa. Commw. 1974). Where "a full and complete record of the proceedings before the [school board] was made, the court shall hear the appeal without a jury on the record certified by the [school board]." 2 Pa. C. S. A. § 754(b). In that event the review in the appellate courts is limited to the record before the school board. Monaghan, 618 A.2d 1243 ("Applying the Springfield School District criteria to the instant matter, we conclude that there was a full and sufficient record upon which the trial court could resolve the issues presented. Therefore, having concluded that a full and complete record of the proceedings was made before the School Board, the trial court's proper scope of review is set forth in Section 754(b) of the Administrative Agency Law. Accordingly, the trial court did not err by failing to conduct a de novo hearing or remand the proceedings.").

In the present case, there is no question that had McConnell ultimately appealed his suspension, plaintiff's testimony would have become part of the official record before the reviewing court. Indeed, the defendant's solicitor acknowledged that the McConnell hearing was

an official "evidentiary hearing."  See Defendant's Proposed Findings and Conclusions (Doc. No. 33) at p.1, No. 6 ("This was a formal hearing in order for there to be a formal adjudication of the Board relative to [McConnell's] discipline.").  And as such the testimony was enveloped with all the basic  attributes and significance that lead the Reilly court to recognize "that an employee's official responsibilities provided the initial impetus to appear in [a tribunal] is immaterial to his/her independent obligation as a citizen to testify truthfully" and the First Amendment protection associated with fulfilling that duty is not "vitiated by one's status as a public employee."  Reilly, 532 F.3d at  231.  Indeed, as previously noted in certain situations such testimony provides the only avenue for evidentiary development of the historical events at issue and thus the "the individual and societal interests" served when citizens provide such testimony is vital to the integrity of the judicial process Pennsylvania law prescribes.  Thus, unlike the setting in Garcetti, plaintiff's appearance in the forum and testimony under oath clearly constituted an "analogue to speech by citizens who are not government employees."  Garcetti, 547 U.S. at 424; compare Reilly, 532 F.3d at 230 (explaining fundamental role that testimony plays in our society and citing in support Robinson v. Balog, 160 F.3d 183, 189 (4th Cir. 1998) ("By responding to the Board's invitation to testify at a public hearing and by cooperating with law enforcement investigators, Robinson and Marc spoke not in their capacity as ... public employees, but as citizens upon matters of public concern.") (citations omitted)).

Third, defendant's contention that plaintiff's testimony did not involve a matter of public concern is undermined by the record before the board and the testimony of virtually all board members who testified before this court.   "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other

concern to the community.'"  Connick v. Myers, 461 U.S. 138, 147 (1983); accord Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001).  The inquiry is informed by the content, form and context of the speech in question.  Baldassare, 250 F.3d at 195.  "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing…on the part of government officials.'"  Id. (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993).  Moreover, the Supreme Court has stated that speech addressing public concerns includes "subject[s] of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  City of San Diego v. Roe, 543 U.S. 77, 84 (2004); see also Smith v. Central Dauphin School District, 419 F. Supp. 2d 639, 647 (M.D. Pa. 2005) (teacher complained of the presence of mold in the school district's buildings, a "topic of great concern to the community, especially to those families whose children attend the schools in the district").

There can be little doubt that plaintiff's testimony at the McConnell hearing addressed a matter of public concern.  First,  "[w]hen an employee testifies before an official government adjudicatory or fact-finding body, he speaks in a context that is inherently of public concern."  Green v. Philadelphia Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997) (quoting Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir.1989), cert. denied, 493 U.S. 1019 (1990)).  And this is so whether the individual voluntarily appears or is compelled to do so.  Id. Thus, the setting and context in which plaintiff testified speaks volumes to whether it should be deemed to be of concern to the public.

Furthermore, the McConnell disciplinary matter was divisive and divided both the board and the community.  McConnell's continued employment as a Dean of Students without

31

appropriate college certification subjected the school district to potential financial penalties under the School Code.[5]  After an informal discussion of the matter with the board in executive session, Skender imposed a 20 day suspension on McConnell without pay.  The events surrounding McConnell's suspension were perceived as a local controversy and several published newspaper articles were written about the suspension.   Several witnesses that testified before this court admitted that the public response surrounding McConnell's suspension was significant and the matter became a contentious and divisive issue in the Chartiers Valley community.  Board members were the recipients of significant public outcry about the matter.  Witnesses that attended the McConnell appeal suspension hearing estimated that between 50 and 100 members of the community were in attendance.  And most importantly, the hearing was an evidentiary fact-finding process about the propriety of the suspension of a public school administrator and coach.

     The McConnell suspension also became a divisive and contentious matter that divided the board.  Skender discussed his intent to impose a suspension with the board in executive session.  At that juncture the board members only voiced their opinions about the propriety of the suspension and did not take formal action.  In an informal discussion the members decided to increase the 10 day suspension Skender was recommending to 20 days by a vote of five yes', three no's and one abstention.  McConnell Hearing Transcript of November 1, 2006, (Doc. No. 1-10) at 137.  As recounted by board member Beth McIntyre, some community members expressed their concern about matters that led to discipline against McConnell, but other

_____

     [5]The Chartiers Valley School District ultimately was fined $11,826.60 for failing to ensure that McConnell complied with the applicable state certification requirement.

members made it known in no uncertain terms that they want McConnell to remain as basketball

coach.  And as former board member Anthony Moses indicated, the McConnell situation became

terribly divisive in both the community and among board members.[6]  Thus, the McConnell

matter was contentious from the beginning and its divisiveness continued to impact the board

well after the discipline was imposed.

The McConnell matter involved the issue of whether an administrator and coach holding

a position regulated by the Pennsylvania School Code should be disciplined by the administration

after failing to acquire the qualifications to hold the position over the course of several years.  It

also involved the ongoing use of public funding in a manner that was not in compliance with

state law and regulations.  Citizens of the community had a significant interest in assuring that

the individuals holding such positions within the district were properly qualified, and if not,

understanding what measures should be taken to correct the situation.  They also had an interest

in assuring that those within the operations of the school who significantly contributed to the

educational advancement of the students continue to be able to do so.  Public opinion about these

matters ran deep and was divided.  In short, it is difficult to perceive of a situation that would be

more indicative of "a matter of public concern" at a local level.

Finally, defendant's assertion that it may simply rely on plaintiff's duties to defeat her

claim to First Amendment protection seeks to bypass entirely any obligation on its part to set

forth an employment-based justification for treating plaintiff differently than any other member

---

[6]All members who voted to open up the basketball coach position subsequently "reversed" their position by voting to retain McConnell in the position except Moses, who subsequently was not reelected in the fall election.  Board members Herb Ohliger and Pam Poletti were elected to the board in that election.  Poletti had been booster president for the basketball team.

of the general public.  See Garcetti, 547 U.S. at 418 (if the employee spoke on a matter of public

concern, the "question becomes whether the relevant government entity had an adequate

justification for treating the employee differently from any other member of the general public.");

accord Reilly, 532 F.3d at 216; Pro, 81 F.3d at 1291.  Testimony under oath does not enjoy

"absolute" protection under the First Amendment.  Pro, 81 F.3d at 1291 n. 4.  Instead, a

balancing analysis must be undertaken "between the interests of the [employee], as a citizen, in

commenting upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees" before any

speech can be deemed to be protected.  Id. at 1287 (quoting Pickering, 391 U.S. at 568); Watters

v. City of Philadelphia, 55 F.3d 886, 895 (3d Cir. 1995) ("We must weigh the interests on behalf

of the speech against the interest of the City as an employer 'in promoting the efficiency of the

public services it performs through its employees.'") (quoting  Rankin v. McPherson, 483 U.S.

378, 388 (1987).

Defendants fail to identify any interest the district had in promoting the efficiency of the

public services it provides that was impaired or jeopardized by plaintiff's testimony.  Nor have

they identified any way in which the effectiveness of the district's services was or could be

hindered by plaintiff's protected speech.  Plaintiff provided truthful testimony.  A mere asserted

right to control or censor speech in such a context because the impetus for it was the performance

of work-related duties does not satisfy the need to show the impairment of efficiency or

effectiveness in carrying out a school district's public mission.  Compare Hansen v.

Soldenwagner, 19 F.3d 573, 577-78 (11th Cir. 1994) (police officers imposing discipline on

officer that gave deposition testimony in a vulgar, insulting and unprofessional manner were

34

entitled to qualified immunity in light of uncertainty created by <u>Pickering</u> balancing analysis).
Consequently, the balancing required under <u>Pickering</u> weighs in plaintiff's favor.

It follows that plaintiff spoke as a citizen when she testified truthfully at the McConnell disciplinary appeal hearing.  Her testimony was and involved a matter of public concern.
Defendant did not have adequate justification as an employer for treating plaintiff differently than any other member of the general public engaging in the same conduct.  Therefore, plaintiff's speech is entitled to First Amendment protection and the showing of irreparable harm needed for injunctive relief is satisfied.

Plaintiff also must show a reasonable probability of success on the merits to be entitled to an injunction.  <u>See</u> <u>Allegheny Energy, Inc. v. DQE, Inc.</u>, 171 F.3d 153, 158 (3d Cir. 1999) (citing <u>ACLU v. Black Horse Pike Regional Bd. Of Educ.</u>, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (<em>en banc</em>)).  "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing [of] a reasonable probability that it will prevail on the merits."  <u>Punnett v. Minim</u>, 621 F.2d 578, 583 (3d Cir. 1980).

A three-part test is utilized to assess a public employee's First Amendment claim of retaliation.  <u>See</u> <u>San Filippo v. Rutgers, et al</u>, 30 F.3d 424, 430-31 (3d Cir. 1994).  First, the employee must demonstrate that the activity in question is protected.  <u>Reilly</u>, 532 F.3d at 224; <u>accord</u> <u>Holder v. City of Allentown</u>, 987 F.2d 188, 194 (3d Cir. 1993).  Second, the employee must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.  <u>Green</u>, 105 F.3d at 885;  <u>Holder</u>, 987 F.2d at 194 (citing <u>Czurlanis v Albanese</u>, 721 F.2d 98, 103 (citing <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 429 U.S.

274 (1977)).  The alleged  retaliation cannot be trivial or *de minimis* and must be "sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights."  McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  After this initial burden is met, the employer may still justify the adverse action by showing that it would have reached the same decision even in the absence of the protected conduct.  Green, 105 F.3d at 885.  Defendant bears the burden of proving this defense by a preponderance of the evidence.  Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 416 (1979) (citing Mt. Healthy, 429 U.S. at 287).

It has already been determined that plaintiff's speech is protected by the First Amendment.  Accordingly, this factor is satisfied.

The record also supports plaintiff's contention that she can prove that her protected speech was a "substantial" or "motivating factor" in the adverse employment decision.  Mt. Healthy, 429 U.S. at 287; Green, 105 F.3d at 885.  Plaintiff seeks to establish that the votes of at least Choura and Kelly, if not others, to open her contract were cast in retaliation for her testimony concerning McConnell, and this ultimately produced the needed majority to do so.[7]

---

[7]The vote to open plaintiff's contract was by a margin of 6 to 3.  Although it was not a foregone conclusion that plaintiff would not be considered for the position in the future, the vote placed plaintiff's opportunity for renewal of her contract in question.  Given the general understanding in the district that opening up a contract often meant the individual was going to be replaced, such action was more than a *de minimis* or trivial form of retaliation and would be sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights.  Proving that two votes were tainted with retaliatory animus would reverse the composition to 4 to 5 in favor of plaintiff.  Thus, proving that 2 members of the board acted with such animus is enough to show that the initial vote that started the adverse action satisfies the requirement to prove that the protected activity was a substantial or motivating factor in bringing about the retaliatory action.  Furthermore, as discussed more thoroughly infra, plaintiff has met her burden for showing a likelihood of proving that the board's ultimate decision not to revisit and formally resolve the issue of offering her a new contract was the product of retaliation for exercising First Amendment rights, which then resulted in the decision to permit plaintiff's employment with the district to expire.

Defendants contend that plaintiff has not produced sufficient evidence to prove that her testimony was a motivating factor in the decision, asserting that the presentation of a contract at the last minute and the need to comply with the timing requirements under the School Code provide more than a facially valid reason for the vote, and, in any event, the temporal proximity between the time plaintiff testified and the opening of her contract undermines sufficiently her burden of proving a causal relationship between the protected activity and the alleged retaliatory action.

An analysis of the evidence supports the proposition that the specter of retaliatory animus looms large.  First, plaintiff and her witnesses were very credible and quite consistent in their account of the events brought into focus.  In contrast, defendants' witnesses' flat denials and explanations for the actions taken were less than convincing.  But even beyond the assessments that flow from credibility and demeanor, numerous aspects of the record create inferences and provide corroborating evidence in support of plaintiff's claim.

First, there is more than ample evidence demonstrating that board members Choura and Kelly strongly disapproved of plaintiff's testimony at the McConnell hearing.  When plaintiff was asked to reveal which board members had spoken negatively about McConnell's repeated failures to seek certification, plaintiff indicated she could not recall the names of those members.  Choura and Kelly booed and expressed their disapproval of her testimony.  Preliminary Injunction Hearing Transcript of 10/28/09 (Doc. No. 29) ("HT of 10/28") at  22-23.  Choura denied ever making such comments.  Preliminary Injunction Hearing Transcript of 10/29/09 ("HT of 10/29"), at 201.   Plaintiff's version was corroborated  by the testimony of CVSD Police Officer Walter Schultz, who was present at the McConnell hearing and remembered Choura and

Kelly being "seated in front of [him] almost directly."  HT of 10/28 at 73-74.  Specifically, Schultz recalled hearing Choura and Kelly booing and hissing during plaintiff's testimony.  Id. Plaintiff also claimed that Choura stood up and remarked that plaintiff was lying, and demanded to be heard.  Schultz again corroborated plaintiff's account.  Id.   Indeed, the McConnell hearing transcript itself reflects plaintiff's and Officer Schultz's version of events:  at one point during plaintiff's testimony things got so heated that hearing officer Evashavik had to remind the audience to "please try and keep any verbalizations to a minimum."  McConnell Hearing Transcript, Plaintiff's Exhibit I,  at 150.   The McConnell transcript also reveals that an audience member stood up during plaintiff's testimony and demanded that the record be changed.  That person was Choura.  HT of 10/28 at 23.

The proposition that Choura and Kelly strongly disapproved of plaintiff's testimony at the McConnell hearing is further supported by the preferential treatment Choura and other board members showed McConnell both before and following his appeal hearing, despite the school district being fined $11,826.60 for McConnell's noncompliance.  Prior to the hearing, when the board originally considered McConnell's suspension, Choura abstained from voting on the matter altogether; the three that voted for a ten-day suspension were Kelly, Galluze and Figorski, while the remaining school board members voted for a twenty-day suspension.  McConnell Hearing Transcript at 151.  When, after the hearing, former board member Hilty moved on April 10, 2007, to open all boys' basketball coaching positions, including McConnell's, Choura, Kelly, Figorski and Galluze voted against the measure, with Choura commenting that "it is a very black day in the history of Chartiers Valley" and that McConnell "put CV on the map."  The meeting notes state that "Figorski dittoed Mr. Choura's comments."  Board member Petronsky countered

by saying: "by opening up these positions doesn't mean we won't rehire these coaches."  Chartiers

Valley School District, Special Action Meeting Notes of April 10, 2007 (Plaintiff's Exhibit No.

7), at 2.  Two weeks later, Choura moved to re-employ McConnell as the head varsity coach for

the school year, and the motion was seconded by Figorski, and the other votes in favor were cast

by Galluze and Kelly.  Choura remarked that opening up a position is equivalent to firing a

person, and commented that "you don't fire a great coach."  Regular Meeting Notes of April 24,

2007 (Plaintiff's Exhibit No. 9), at 2-7.  Kelly agreed, stating that McConnell had "done amazing

things for the students…as coach and Dean of Students, and she votes yes."  Id. at 7.

Less than four months after the board reinstated McConnell, at a Special Action Meeting

in August of 2007, Galluze moved to approve an increase in plaintiff's and other administrative

employees' salaries as recommended by the superintendent.  Plaintiff's Exhibit No. 10 at 9.  Kelly

and Choura abstained from voting, stating they would have "liked to review this information"

and "did not receive the information in their weekly packet."  Id.  When board member Moses

pointed out that the increases were discussed three months prior, Choura and Kelly

acknowledged that they were, but "wanted to have the proposal in writing for review before

voting."  Id.  All other board members voted to pass the motion, and plaintiff ultimately received

her salary increase.  Id.

It was at this same meeting that the board created a new position for McConnell,

Transportation and Activities Coordinator, so he could remain a full-time employee at the district

without having the requisite certification.  Id.  Choura voted "no" to even this measure, and

stating that he was a "big fan" of McConnell and felt that placing him in a new position that paid

$10,000 less was, in fact, penalizing him.  Id.  Kelly and Moses also voted no, with all other

member voting yes.  Id.

Plaintiff credibly testified that since the McConnell hearing in 2006, Choura has not spoken to her.  She asked him to come to her office so they could "figure out why he has not spoken to her since that hearing, why he [turns] his head, as well as sometimes Bridget Kelly and other members of the board."  HT of 10/28 at 60-61.  Choura denied having engaged in such conduct, but did not provide any meaningful account of ongoing interaction between himself and plaintiff.

The above is more than enough to support the following findings: Choura opposed  any measures to discipline McConnell and any measure to remove him from either his position as Dean of Students or as Basketball Coach.  Kelly opposed any measure to remove McConnell from either his position as Dean of Students or as Basketball Coach.  Choura and Kelly were unsatisfied with plaintiff's testimony at the appeal disciplinary hearing.[8]  Choura and Kelly supported all measures to re-instate McConnell as basketball coach and opposed any measure

---

[8]Defense counsel made much of the proposition that plaintiff did not specifically identify what was objectionable about her testimony.  But a review of her testimony makes clear that she did not identify those board members who opposed any adverse measure against McConnell when the matter was first brought up (either affirmatively or by implicit inference) and she testified in a manner that suggested the board took certain positions and had certain views about McConnell's conduct as a unified body.  Clearly they did not and her testimony did not reflect the supporters of McConnell such as Choura who opposed any such action or those who supported a lesser sanction than was imposed.  Given the community outcry and political impact the events surrounding the discipline had in the subsequent voting and composition of the board, it is clear that those who steadfastly supported McConnell at all costs to the district would want to have their position and support for McConnell distinctly noted on any formal record. The factfinder will be entitled to draw such an inference and we find that such an inference properly is drawn for the purposes of the instant motion.  Furthermore, much like a political affiliation case, Choura and Kelly's steadfast support for McConnell and the political ramifications from the entire ordeal supply well-supported grounds for finding retaliatory motive in future adverse actions.

40

that would remove him from Dean of Students by creating a position that did not require certification under the School Code.  Choura and Kelly resented plaintiff for testifying against McConnell and did not interact with her or vote on matters that favorably would affect her.

The record also supports plaintiff's contention that Choura told Art Turner that plaintiff was not going to receive a contract because of her testimony against McConnell.  Plaintiff recounted the discussion with Turner in detail, no doubt triggered by the analogy to Eleanor Roosevelt.  Turner admitted having such a conversation but denied that he made any statement about Choura saying plaintiff would not get a contract because of her testimony against McConnell.  Instead, he recollected that the conversation happened around the time when the board voted to open up plaintiff's contract and she was the one who was both assuming she would not get a contract and that the reason for that was her testimony.  This explanation is suspect.  There was no reason for Turner to make the Eleanor Roosevelt analogy unless he knew or had good reason to believe that adverse or disappointing events were in plaintiff's future.  And under plaintiff's account, the analogy is a logical conversation lead-in to breaking bad news such as hearing from a thirty-two-year board member that a person's contract was not going to be renewed.  And even if one were to assume an account more in line with Turner's, the analogy strongly suggested that the contract had been opened up for the purpose of ending plaintiff's course of employment, a proposition that carries with it a strong inference that motivations other than concern from the lateness of the presentation of the proposed contract were at work.

Furthermore, Turner was in a position to have insight into the impressions and intentions of Choura and those aligned with him on the board.  Choura was the director assigned to the buildings and grounds division of the district and Turner was director of facilities.  They often

41

had discussions and conversations at school.  In addition, Turner and Choura had lunch or dinner together a couple of times a month.  So they conversed frequently and there would have been many opportunities for such an informal discussion.

Moreover, plaintiff's version of the events between her and Turner is further corroborated by Kaminski's testimony concerning Turner's indication that he would not tell the truth when called to testify.  Turner explained his statements made in front of Kaminski as part of an unexpressed desire to make a joke or be funny by saying to plaintiff something to the effect that "you can't handle the truth."  But by his own testimony he never made such a statement and from Kaminski's recollection Turner's tone and demeanor in responding to plaintiff's inquiry at the time was quite somber and serious.  Kaminski was very credible about the matter and his getting up and walking out while making the comment that "I might have to testify to this" lends significant support to the accuracy of his perception.

The circumstances surrounding the formation of the contract presented to the board for plaintiff also support an inference that other motives were a play in the decision to open plaintiff's contract.  Plaintiff received notification from the board dated March 27, 2009, that her contract would expire on October 31, 2009.  Consideration of renewing plaintiff's contract was on the agenda of the board meetings of April 14, 2009, April 28, 2009, and May 28, 2009, and the matter was discussed in executive session at these meetings.  Kaminski and Skender participated in these discussions with the members of the board.

Commencing on May 12, 2009, Kaminski began working with plaintiff to devise a contract that would be acceptable to her and the administration.  That night, he suggested to the board in executive session that they should form a committee to work on an acceptable contract.

Members McIntyre and Galluze asked to be on the committee.[9]  Kaminski provided plaintiff with a template contract that he thought would be acceptable to the board and began to provide plaintiff with his insight into what should be included or eliminated from plaintiff's proposals. In the days that followed Kaminski and plaintiff exchanged several emails containing draft contracts.  Kaminski and plaintiff hammered out a proposed agreement which was emailed to the solicitors sometime after May 14, 2009, but prior to May 28, 2009.

On the evening of May 27, 2009, Solicitor Maiello became aware through discussions with Skender that there might be outstanding issues that plaintiff wanted to be addressed in the final draft of her contract.  Solicitor Maiello emailed a template contract used for a prior assistant superintendent with modifications so that it could be used for plaintiff.  On the morning of May 28, 2009, solicitors Maiello and Brungo became aware that there might be some remaining issues regarding plaintiff's contract and they decided to go to the school to hammer out an agreement that would be acceptable.  They discussed additions and modifications to the draft that plaintiff wanted over the course of several hours.  These included the notice provisions for renewal and other matters.  In the end, the group finalized a proposed contract that was acceptable from their perspective and emailed the draft to Skender for presentation to the board that night.

That evening Solicitor Brungo attended the board meeting and he and Skender reviewed

---

[9]Figorski volunteered to form and chair this committee.  McIntyre advised Figorski by email the next day that when the committee was formed she wanted to be on it.  No such committee was ever formed and McIntyre never received a substantive reply to her email. Beyond Figorski's explanations that it was a process and the board never had an opportunity to pursue the matter (over the several months the matter could have been resolved) or that it was not the responsibility of the board to form a committee to address contractual issues, no explanation has been offered for why such a committee was never formed.

the contract with the members of the board. "Regardless of what [Solicitor Brungo] would say as far as explanation or what the superintendent might explain, [several board members'] concern was they had a contract that they did not have an opportunity to review individually." Testimony of Solicitor Brungo, HT of 10/29 at 7. Brungo then advised the board about its options if they were unwilling to approve the contract and wanted to further negotiate with plaintiff about the terms or her contract. He provided Figorski with a statement to read in the event the board decided to open up plaintiff's position.

The above supports the following findings: the proposed contract was drafted in a format that the solicitors found acceptable and contained provisions that the administration had approved. The solicitors did not find any particular term or provision untenable and Solicitor Brungo and Superintendent Skender attempted to explain its provisions to the board's satisfaction in executive session. Certain members of the board were unwilling to accept Solicitor Brungo or Superintendent Skender's explanations on the stated basis that they had not been able to read and review the contract themselves prior to that night's meeting. No other basis for not accepting the proposed contract was identified. It was repeatedly emphasized by certain board members that the need to open up plaintiff's position was no reflection on plaintiff's abilities or job performance.

Moreover, the two attorneys who were experts in formulating the appropriate contracts for the district had spent considerable time on the proposed draft and were willing to have the board approve the contract if the board chose to do so. Solicitor Maiello advised Figorski that although the contract was in acceptable form, it was up to the board to determine whether the contract was what it wanted to offer plaintiff. At the meeting Solicitor Brungo never advised the

board that it should not approve plaintiff's contract and felt comfortable enough with it to permit the board to approve it.  He advised that if they were unwilling to approve it due to timing issues, they should open up plaintiff's position so that further negotiation could occur.  The board had approved professional contracts in the past under similar circumstances, although it had not done so consistently.  Testimony of Board Member McIntyre, HT of 10/30 at 86-87.   Thus, the issue of whether there should be any remaining negotiation over the contract's final terms was a matter that was left to the board members' discretion.

If the opening of plaintiff's contract on the night of May 28, 2009, reflected the entire basis for plaintiff's retaliation claim, then the fact that the proposed contract was acceptable to the solicitors and the administration would not carry with it an inference of retaliatory motive.  But there is much more to plaintiff's claim: she claims that the stated reason was pretextual and additional proof of retaliation is presented by (1) additional statements made by certain board members after the May 28, 2009, vote, (2) the way she was treated by the board thereafter, and (3) the failure of the board to take further action or make any response to her proposed contract at any time prior to the expiration of plaintiff's existing contract.  These aspects of the record do supply an additional basis to support a finding that plaintiff's contract was opened up and not renewed due to retaliation in violation of the First Amendment.

Contrary to Kaminski's suggestion, the board did not form a committee to work on plaintiff's contract.  After the May 28, 2009, vote, Figorski sent out an email asking for input on plaintiff's proposed contract from the board members.  Members McIntyre, Frey and Petronsky all indicated that they thought the contract was fine as presented; member Galluze proposed changes in his response.  Board members Choura, Kelly, Poletti and Ohliger did not respond.

Figorski and Kelly then took the unusual measure of having the meeting minutes amended to assure that the neutral motivations for board's action and corresponding legal advise were detailed in the public record.

Plaintiff hired counsel to represent her and on June 9, 2009, a letter was sent to solicitors Brungo and Maiello advising them of the representation.  At the next scheduled board meeting certain board members asked Solicitor Maiello in executive session if plaintiff was required to be in attendance at executive sessions.  He advised that she was not legally required to be there.  The board then directed Skender to tell plaintiff that she would no longer be permitted to attend executive sessions.  From that point forward plaintiff was excluded from attending all executive meetings even though her contract was not on the agenda.  Prior to that time plaintiff had attended all executive and public sessions.  It was Solicitor Maiello's understanding that the primary reason for plaintiff being excluded was that she had hired an attorney to protect her rights.  Testimony of Solicitor Maiello, HT of 10/28 at 183.

Moreover, very credible testimony was presented that at the August 11, 2009, board meeting, McIntyre asked in executive session whether there was any interest in negotiating a contract with plaintiff.   Two other members said yes while the rest ignored the inquiry.  Galluze then stated: "she hired an attorney, so I wash my hands of her." HT of 10/28 at 134, 140, 143.  Kelly agreed, and stated "it does not show good faith, I have no interest." Id. at 134, 140, 143.  McIntyre repeated the inquiry on other occasions and the same board members that had not responded did not respond or otherwise acknowledge that the inquiry had been made.

The above supports the following findings: Galluze and Kelly made statements indicating they would not support any further negotiations with plaintiff because she had hired an attorney

to protect her rights.  They had no interest in formulating a contract with plaintiff and they

harbored bias and resentment against her for doing so.  Plaintiff filed suit on August 17, 2009,

and thereafter Kelly and Galluze held fast to their position that no further negotiations with

plaintiff would occur because she had hired counsel and had taken steps to protect her rights.  At

least three board meetings occurred between the time plaintiff filed suit and her contract expired.

Kelly and Galluze continued to act in a manner consistent with their stated intent and declined to

revisit negotiations with plaintiff during this time.  Three board members were in favor of

approving the proposed contract as submitted or taking up discussions about negotiating a new

contract with plaintiff at all times between the date plaintiff filed suit and the expiration of her

existing contract.

      "The Supreme Court has explicitly held that an individual has a viable claim against the

government when he is able to prove that the government took action against him in retaliation

for his exercise of First Amendment rights."  Anderson v. Davila, 125 F.3d 148, 160 (3d Cir.

1997) (citing Mt. Healthy, 429 U.S. at 276).  As the Anderson court explained:

> In the seminal case of Mt. Healthy, a non-tenured teacher brought suit against the
> local school Board when it declined to renew his contract. See Mt. Healthy, 429
> U.S. at 276 . . . . The Court held that, even though the teacher lacked any
> expectation in further employment, the teacher still could make out a claim under
> the First and Fourteenth Amendments if he could show that the Board fired him in
> retaliation for speech. As the Court explained:
>
>> Even though [the teacher] could have been discharged for no
>> reason whatever, and had no constitutional right to a hearing prior
>> to the decision not to rehire him ... he may nonetheless establish a
>> claim to reinstatement if the decision not to rehire him was made
>> by reason of his exercise of constitutionally protected First
>> Amendment freedoms.

Id. at 160-61 (quoting Mt. Healthy, 429 U.S. at 283).  Thus, under Mt. Healthy and its progeny, a

legitimate and constitutional act by a government employer can be unconstitutional when it is demonstrated that it was undertaken in retaliation for the exercise of First Amendment rights. Id. at 161; accord Rutan v. Republican Party, 497 U.S. 62, 72 (1990) (reaffirming principle that a government employer cannot "deny a benefit to a person because of his constitutionally protected speech or associations" even though the employee has no right or claim to the benefit in question) (collecting cases in support); Wilkerson v. New Media Technology Charter School, Inc., 522 F.3d 315, 321 (3d Cir. 2008) (the "failure to rehire, promote, or transfer [can] constitute First Amendment retaliation, even though the employee has no legal entitlement to be rehired, promoted or transferred.") (citing Suppan v. Dadonna, 203 F.3d 228, 234 (3d Cir. 2000)).

Moreover, "[t]he Supreme Court has consistently held that an individual's constitutional right of access to court is protected by the First Amendment's clause granting the right to petition the government for grievances." Id. (citing California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) ( "The right of access to the courts is indeed but one aspect of the right of petition.") and Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir.1990)).  The Third Circuit has expressly held  "a school-teacher could make out a claim against a school board if she [can] prove retaliation in response to her filing of a lawsuit." Anderson, 125 F.3d at 162 (citing  Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1175 (3d Cir.1990)).  And this is so even though the employee has no property or other right to the contract or other government function which the plaintiff was denied.  Wilkerson, 522 F.3d at 231.

The protection afforded to the right of access extends beyond the formal filing of a lawsuit and encompasses "[t]he right to hire and consult an attorney" about protecting one's legal rights.  Cipriani v. Lycoming County Housing Authority, 177 F. Supp.2d 303, 323 ( M.D. Pa.

2001) (quoting <u>Denius v. Dunlap</u>, 209 F.3d 944, 953 (7th Cir. 2000) (citing <u>Deloach v. Bevers</u>,

922 F.2d 618, 620 (10th Cir. 1999) ("The right to retain and consult an attorney ... implicates not

only the Sixth Amendment but also clearly established First Amendment rights of association

and free speech.")).  A plaintiff need not show that the intent to invoke one's rights stems from a

matter of public concern; it is sufficient if the intended petitioning is grounded on a good faith

belief in the validity of the claim or rights involved.  <u>San Filippo</u>, 30 F.3d 443 ("The mere act of

filing a non-sham petition is not a constitutionally permissible ground for [taking adverse action

against]  a public employee.").  Announcing an intent to bring a lawsuit or to pursue legal

recourse is sufficient to place the government on notice of an intent to invoke the protections

afforded under the Petition Clause.  <u>Anderson</u>, 125 F.3d at 162 (recognizing the protection

afforded to protected activity had attached where the claimant filed a claim with the EEOC, hired

a lawyer who had communicated the claimant's intent to pursue legal recourse and a newspaper

article indicated the claimant's intent to pursue legal recourse); <u>Bradshaw v. Township of</u>

<u>Middletown</u>, 296 F. Supp.2d 526, 546 (D. N.J. 2003) (protection afforded by the First

Amendment's Petition Clause attached when employee informed employer of intent to seek legal

recourse), <u>aff'd</u>, 145 Fed. Appx. 763 (3d Cir. Aug. 29, 2005)).

       The District's solicitors received notice on June 9, 2009, of plaintiff's intent to pursue

legal recourse if the parties could not resolve their differences surrounding plaintiff's right to

notice under the existing contract.  To the extent Kelly, Galluze and any of the other board

members decided not to pursue  further negotiations with plaintiff because she hired a lawyer and

then filed suit to protect her rights, they retaliated against her for exercising her First Amendment

rights.  Three board members expressed their desire to negotiate a contract with plaintiff at all

relevant times and in fact had indicated they were fine with the contract that had been presented to the board on plaintiff's behalf on May 28, 2009.  After the issue of further consideration was brought up in both executive and public board meetings, the same three indicated they were willing to proceed with the matter.  The others declined to even acknowledge that the issue had been raised.  At least Kelly and Galluze continued to decline to consider further negotiations with plaintiff because she filed suit against defendants.  Their expressed position was considered by the other board members who decided against further discussing acceptable terms for a contract with plaintiff and/or responding to the proposed contract that had been presented by the administration.  Thus, at least two members were motivated not to offer or further negotiate a contract with plaintiff in violation of the First Amendment, and this motivation became a substantial factor in the decision not to offer a contract to plaintiff prior to the time her existing contract expired.

In summary, the record supports the following findings: Kelly and Choura voted to open plaintiff's position in part because of plaintiff's testimony against McConnell.  Choura believed that taking such measures was the equivalent of "firing" plaintiff, i.e. not renewing plaintiff's contract.  It was Choura's and Kelly's intent to see to it that plaintiff did not receive a new contract because of her testimony against McConnell and at all relevant times that intent played a substantial role  in their decision-making regarding the renewal of plaintiff's contract.  They thus acted with illegal motivation.

Kelly and Galluze harbored bias and resentment against plaintiff for invoking the right to hire an attorney and they harbored bias and resentment against plaintiff for filing suit to protect her rights.  Each of these members continued to refuse to further consider or negotiate the terms

of a new contract for plaintiff because she had invoked her First Amendment rights to petition for redress.  Thus, at least Choura, Kelly and Galluze declined to give any additional consideration to the terms of a new contract for plaintiff from the time plaintiff filed suit until her existing contract expired for motives that were in violation of the First Amendment.  Three other members were prepared to approve the contract that had been submitted on plaintiff's behalf or negotiate over the terms of a contract for plaintiff that plaintiff and the other members of the board would find acceptable.

Plaintiff's testimony given at the McConnell hearing was a substantial factor in the board's decision to open up plaintiff's position at the May 28, 2009, hearing.  Plaintiff's hiring a lawyer and filing suit were substantial factors in the board's decision not to discuss, negotiate and offer a new contract to plaintiff prior to the time her existing contract expired.  Plaintiff has established a reasonable probability of success on the merits.[10]

---

[10]Defendants correctly note that the record must contain sufficient evidence from which the finder of fact can causally link the materially adverse action to the alleged retaliatory animus. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  Where a challenge to the sufficiency of a plaintiff's evidence has been made as to causation, two central factors generally are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "pattern of antagonism in the intervening period." Jensen v. Potter , 435 F.3d 444, 450 (3d Cir. 2006) (quoting Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) and Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)), overruled in part on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive.'" Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)).  "But even if 'temporal proximity ... is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus."  Id. This is because the motivation of any individual is a question of fact, the resolution of which cannot be reduced to an application of one particular formula or another. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000); Moore v. City of Philadelphia, 461 F.3d 331, 346 (3d Cir. 2006).  Thus, where the issue of the legal sufficiency of the evidence on causation has been raised, it is important to consider all of the proffered evidence as a whole to determine whether it "may

suffice to raise the inference." <u>Jensen</u>, 435 F.3d at 450 (quoting <u>Farrell</u>, 206 F.3d at 280 and citing in support <u>Kachmar v. SunGard Data Systems, Inc.</u>, 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

Defendants' challenge to the sufficiency of plaintiff's evidence of causation is unavailing. First, contrary to defendants' assertion,  the "mere passage of time is not legally conclusive proof against retaliation."  <u>Woodson</u>, 109 F.3d at 920 (quoting <u>Robinson v. SEPTA</u>, 982 F.2d 892, 894 (3d Cir.1993); <u>see also</u> <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1085 (3d Cir.1996); <u>cf</u>. <u>Kachmar</u>, 109 F.3d at 178 ("By summarily concluding that there was too great a gap between Kachmar's protected acts and her termination, the district court failed to give Kachmar the opportunity to delve further into the facts by discovery.").  Second, the record as a whole contains more than ample evidence to permit a finding of causation.  While a fair amount of time did pass between plaintiff's testimony at the McConnell hearing and the events at issue, May of 2009 constituted the first time the board was asked to consider the renewal of plaintiff's contract. Furthermore, the record does reflect a history of antagonism between plaintiff and board members Choura and Kelly.  Each had declined to vote on matters that directly affected the administration members' salary increases, which included  plaintiff's increase.  Plaintiff indicated that Choura essentially did not interact with her after the McConnell hearing and after a period of time it became so noticeable that she asked him to stop by her office so they could discuss the situation.  Choura declined to do so.  And while defendants contend that other members involved in the administration, including Morelli, Kaminski and Skender, did have their contracts renewed (<u>see</u> Defendants' Proposed Findings (Doc. No. 33) at ¶¶ 12-15), the record shows only that Kaminski had his contract renewed.  Kaminski had such serious concerns about his likelihood of succeeding that he did not ask for any changes in his contract and even secured work outside the district in the event his contract was not renewed.  And while he could not be sure that  his concern was due to his involvement in the McConnell matter, he thought it necessary to secure work outside the district due to the atmosphere that existed after the McConnell matter had erupted.  Thus, far from reflecting a significant period of time during which any lingering hostilities dissipated, the record indicates that the renewal of plaintiff's contract was the first time any adverse action could be taken against her directly and the circumstances surrounding the only other member of the administration's contract renewal indicated that the disharmony from the McConnell matter was perceived as a serious basis for concern.

In addition to the inferences that are raised by (1) the timing of the renewal of plaintiff's contract, (2) the history of certain board members declining to approve raises for the members of the administration, and (3) the lack of interaction between those members and plaintiff, the testimony and circumstantial evidence surrounding the statements recounted by Turner provide further evidence that suggests a causal link exists between plaintiff's testimony and the opening of her contract.  The board's failure to pursue the matter any further after expressly indicating that the only reason for the adverse action was that the proposed contract had been presented late in the meeting and certain members just wanted to review it before acting provides additional evidence suggesting that there were other motivating factors that had a substantial role in the

Once a plaintiff demonstrates that protected activities were a substantial or motivating factor in an adverse employment action, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287.   Thus, in a dual-motives scenario a defendant may meet this burden by demonstrating that there was an independent basis for the action taken.  Nicholas v. Pa. State University, 227 F.3d 133, 144 (3d Cir. 2000).   In meeting this requirement it is not enough that the defendant can show that it could have taken the adverse action in the absence of the protected activity; instead, the defendant's burden is met only where it shows that it would have taken the same action in any event.  Bradley v. Pittsburgh Board of Educ., 913 F.2d 1064, 1075 (3d Cir. 1990) ("Mt. Healthy requires more than a showing that defendants *could* properly terminate an employee.  It requires a showing that the employer *would* have terminated the employee in the absence of his protected activity.") (emphasis in original). In other words, defendant can prevail on the merits of the constitutional claim by proving the absence of but-for causation.  Suppan v. Dadonna, et al., 203 F.3d 228, 236 (3d Cir. 2000).

Defendants raise the following in support of their position: (1) the School Code required the board to open plaintiff's contract on May 28, 2009; (2) the board did not engage in further

decision-making process.  These inferences are further strengthened by the extraordinary measure of revising the minutes from the May 28, 2009, meeting to assure they reflected that the measure was taken for neutral reasons and upon legal advise.  Finally, the statements made by other board members about their contemplated response to plaintiff's decision to hire an attorney coupled with a number of board member's unwillingness to even discuss the renewal of plaintiff's contract thereafter similarly provides more than ample evidence to draw a causal connection between plaintiff's decision to take steps to protect her rights and the ultimate decision not to take further action aimed at resolving the renewal of plaintiff's contract.  In short, there is more than sufficient evidence to support the findings that plaintiff's testimony at the McConnell hearing and decision to hire a lawyer and file suit were motivating factors that played a substantial role in the decisions to open her position and not to offer her a new contract.

negotiations or discussions about formulating a new contract with plaintiff because the solicitors

advised them not to; and (3) they did not given further consideration to the issue of plaintiff's

new contract because it was Skender's responsibility to present the board with an acceptable

contract on plaintiff's behalf, which was never done.

Each of defendants' affirmative defenses are insufficient as a matter of law to defeat

plaintiff's retaliation claim.  Furthermore, the evidence advanced in support of these defenses

does not displace plaintiff's showing that the exercise of her First Amendment rights played a

substantial role in the decisions leading to the determination that a renewal contract would not be

extended to plaintiff, nor does it provide grounds to suggest that plaintiff will not likely prevail

on the merits.[11]  In short, it appears unlikely that defendant's affirmative defenses will defeat

---

[11]The Mt. Healthy framework for evaluating First Amendment claims of retaliation does
not follow the McDonnell-Douglas tripartite paradigm where a plaintiff claims that the defendant
did not act for the reasons stated.  Nicholas, 227 F.3d at 144-45.  Nevertheless, the defendant's
mere assertion of a legitimate explanation for the action taken does not end the inquiry where it is
alleged that material issues exist as to whether the defendant acted for the stated reasons or some
other reason.  See Green, 105 F.3d 889 n.9 (noting that a pretextual argument and analysis can be
relevant where the question presented is whether an employee was penalized because of the
challenged speech or for some other reason) (citing Waters v. Churchill, 511 U.S. 661, 681-82
(determining by plurality that it is the court's function to consider the reasonableness of the
employer's actions and whether the employer reached its conclusions in good faith, "rather than
as a pretext," in conducting the Pickering balancing analysis that is part of the first element of a
retaliation claim and remanding for further proceedings on the second and third elements because
"[t]hough Davis and Waters would have been justified in firing Churchill for the statements
outlined above, there remains the question whether Churchill was actually fired because of those
statements, or because of something else.")).
     In this jurisdiction, a plaintiff can prove in his case-in-chief or in defending against the
defendant's affirmative defense that any proffered explanation for the adverse action was a
"subterfuge" for action taken in retaliation for protected conduct.  See Johnson v. Lincoln
University of Com. System of Higher Educ., 776 F.2d 443, 454-55 (3d Cir.1985) ("In the instant
case, those activities for which Johnson was found culpable were admittedly considered in his
termination, and were seemingly substantial or motivating factors, as evidenced by the Judicial
Committee report. With respect to the other activities, Johnson will have the burden of proving
that the charges were indeed a 'subterfuge,' and that there really was a 'conspiratorial and

plaintiff's First Amendment retaliation claim.

First, it is true that the School Code required the board to either approve the proposed contract presented on May 28, 2009, or vote to open up plaintiff's position, or do nothing, in which case plaintiff's existing contract would have renewed by operation of law.  It is also undisputed that plaintiff had raised issues about the actual content of her existing contract and therefore the terms of the contract that would have become operative had the board done nothing were not clear to the board.  Therefore, it was reasonable to believe that either the contract presented for approval had to be accepted or the position had to be opened to allow for more time to consider the matter.  And if this were the only dimension of defendants' decision-making to be considered, it appears that defendants would have an ironclad defense.  But the scope of plaintiff's claims and the evidence before the court encompass the entire series of events leading to the expiration of plaintiff's contract, and any fair reading of the record indicates it is likely that plaintiff will able to prove that unconstitutional motivation played a role in both the decision not to approve the proposed contract submitted on her behalf and the decision not to further consider in any meaningful way the terms of a contract that could and should be offered to plaintiff as a renewal contract.

Asserting that the 150 day requirement under the School Code supplied the reason for opening up plaintiff's position does not address the reason why no further action was taken to

---

carefully planned effort to remove plaintiff from the University in retaliation ... for his criticism and other activities,' as alleged in his complaint."); accord Bradley, 913 F.2d at 1075 (holding that a plaintiff must been given the opportunity to prove that a decision was not based solely on stated reasons that could have justified the adverse action but instead was based in part on an impermissible motive).

determine the terms of a contract that would be acceptable to the board.  The board had a proposed contract that had been given significant attention and consideration by Kaminski and Skender and found to be acceptable to them.  It had been presented in a format that the solicitors found acceptable.  The only remaining decision was whether the board found acceptable the specific substantive changes plaintiff had requested and which had been incorporated into the proposed contract.

Furthermore, the stated reason for the action was to provide time to read and consider the actual contract.  While it is clear that certain members of the board did this, no explanation was given as to why the board never determined whether the proposed contract was or was not satisfactory.  Given the board's openly stated position that plaintiff's performance did not have anything to do with its decision to open the position, this lack of further consideration about what was proposed clearly raises the inference that other motives were at play in both the decision to open and the ongoing determinations to do nothing with regard to formulating a contract with plaintiff.

The proffered reason that further consideration was not given to the proposed contract because the solicitors advised the board not to discuss the matter further equally is suspect.  The solicitors did not advise the members of the board to stop discussing among themselves plaintiff's contract and the substantive provisions therein that the board could or would find acceptable.  They merely advised that any response or proposal extended to plaintiff had to be communicated through plaintiff's counsel.  Their advice fell far short of a simple directive not to discuss the matter among themselves and consider what could be accepted in the proposed contract or what could be conveyed in response to what had been proposed.  As Solicitor Maiello

testified, it was his advice to the board that "board members of the District should not be discussing the contract issues with Dr. Whitfield in light of the [representation] letter and they should all go through Mr. Healey from this point forward."  HT of 10/28 at 181.  Thus, the contention that "we were advised by counsel not to [discuss the matter any further]", testimony of Figorski, HT of 10/29 at 57, is inconsistent with the record and fails to justify the decision not to extend any further effort to pursue forming a contract with plaintiff.  To the contrary, the fact that a majority of the members of the board took the position that "we're just not discussing [the issues surrounding plaintiff's contract]", id. at 58, smacks of retaliatory motive.

Similarly, the proffered reason that no further discussions among board members occurred about plaintiff's contract because the board was waiting for the administration to submit something new or different on plaintiff's behalf also smacks of being generated for cover.  The administration had already ironed out what it believed was an acceptable contract and presented that proposed contract to the board after having it reviewed by the solicitors.  The board never responded substantively to that proposal.  To suggest that the administration should have proposed a new or different contract without having any further insight or feedback from the board on what had originally been submitted is wanting in explanation and raises a strong inference that the explanation is but a cover for ulterior motives.

The inferences to be drawn from the evidence undermining defendants' efforts to support its affirmative defenses are made even stronger by the fact that the board consistently has acknowledged that plaintiff was an exemplary assistant superintendant and there were no issues with her performance.  Her long history of laudable and commendable service in all her positions provides forceful evidence that there are other reasons for the decision by a majority of the

57

members of the board not to discuss the issues surrounding her proposed contract.  This evidence supporting the existence of other reasons is made even stronger by the fact that the board has never provided a substantive reason for not extending a new contract to plaintiff.  Testimony of Board Member Jeff Choura, HT of 10/28 at 202.  Given the lack of other persuasive justifications for the course of conduct taken in conjunction with plaintiff's proposed contract, the proposition that resentment of plaintiff's exercise of First Amendment rights was brought to bear in the decisions about the course of conduct involving the potential renewal of plaintiff's contract is indeed well-supported.

It follows that defendants will unlikely be able to prove that they would have taken the same course of action on plaintiff's contract without consideration of her protected speech and petition activity.  Consequently, plaintiff has made a sufficient showing that there is a likelihood that she will prevail on her First Amendment retaliation claim.

The third prong of the analysis governing injunctive relief requires consideration of "whether granting preliminary relief will result in even greater harm to the nonmoving party."  Allegheny Inc., 171 F.3d at 158.   In undertaking this analysis it is appropriate to weigh any relative harm that will be suffered by the parties.  Id.   Injunctive relief cannot be granted where "'granting preliminary relief will result in even greater harm to the nonmoving party' than the irreparable harm that denying preliminary relief would cause to the moving party."  Id.  (quoting American Civil Liberties Union of New Jersey, 84 F.3d at 1477 n. 2).

Defendants contend that granting injunctive relief will constitute an unlawful restriction on their prerogatives to hire an appropriate administrator and provide public education in an efficient and effective manner.   It similarly will inhibit their prerogative to discontinue the use of

an assistant superintendant position.  Finally, at the hearing defendants maintained that placing plaintiff back into the position will be disruptive to the educational process because of the aura of distrust and lack of cooperation that has developed in light of the events that have transpired. Testimony of Board Member Patricia Figorski, HT of 10/29 at 50.

Plaintiff's First Amendment speech and conduct involve two core components to the functioning of a democratic society: testifying as a public citizen on matters of public concern and petitioning the government for redress for the violation of fundamental rights.  They thus are weighty interests which should not be given only minimal consideration in determining the harm that would flow if such rights were to be repressed.  Each of defendants' interests does not outweigh these interests or otherwise provide a basis for denying relief under the circumstances.

Defendants have advanced no evidence to support any of their contentions.  There is nothing in the record beyond bald assertions or conjecture to support the notion that enjoining defendants from retaliating against plaintiff will impede their ability to make decisions about hiring appropriate administrators.  Defendants are not being precluded from exercising their prerogatives about the use of appropriate administrators for the district; they are being enjoined from acting on the basis of prerogatives that are contrary to the core values embodied in the First Amendment.

Similarly, plaintiff's performance record as relayed by defendants makes clear that awarding plaintiff injunctive relief cannot inhibit defendants' ability to provide public education in an efficient and effective manner.  To the contrary, the record indicates that placing an exemplary administrator back into her position can only positively assist defendants in fulfilling their public mission.

Defendants' contention that they have the right to eliminate plaintiff's position has no bearing on the matters before the court. Defendants certainly can choose to do so and eliminate plaintiff's position for non-retaliatory reasons. But there is no evidence that such measures have been considered or were contemplated in the immediate future. Defendants cannot merely reference conjectural possibilities to avoid the imposition of warranted injunctive relief.

Finally, and perhaps most pertinently, the notion that restoring plaintiff to her pre-retaliatory position will be untenable because of the aura of distrust and lack of cooperation that has developed between the parties is unavailing. No substantive evidence was advanced to support this contention. Furthermore, at base this assertion is nothing more than a plea to recognize the resentment board members have toward plaintiff because she invoked her rights to seek relief through the legal system. Such a reaction cannot provide the grounds for finding harm to the non-moving party.

Finally, granting injunctive relief is in the public interest. There can be no question that granting injunctive relief here serves that interest because "the utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony." Reilly, at 230 (quoting Green, 105 F.3d 887). Furthermore, all of the school personnel that were called by plaintiff (Skender, Kaminski, Kendra and Schultz) indicated that based on their perception of what had transpired they had concern about the potential for retaliation as a result of testifying before this court. Clearly, permitting the retaliation against plaintiff to stand would have a chilling effect on the future testimony of any district employee where they are questioned on matters that might be against the interests of the district or one or more of its board members.

Similarly, the ability of public employees to petition for redress without the fear of retaliation is a cornerstone to peaceful resolution of genuine disputes in our society.  To permit retaliation by a government employer for an employee's conduct involving matters of public concern "would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur." San Filippo, 30 F.3d at 442.   Thus, consideration of the public interests at stake clearly weighs in plaintiff's favor.

For the reasons set forth above, plaintiff's motion for injunctive relief has been granted.

Date: April 15, 2010

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Michael J. Healey, Esquire
        Glen S. Downey, Esquire
        Healey & Hornack
        Suite C-2, The Pennsylvanian
        1100 Liberty Avenue
        Pittsburgh, PA 15222

        John E. Freund, Esquire
        King Spry Herman Freund & Faul
        Suite 700
        One West Broad Street
        Bethlehem, PA 18018

        Ira Weiss, Esquire
        503 Fort Pitt Commons Building
        445 Fort Pitt Boulevard
        Pittsburgh , PA 15219